Mahlon S. Miller, Jr., D.D.S. President, Colorado State Board of Dental Examiners Department of Regulatory Agencies 1525 Sherman Street, Room 132 Denver, Colorado 80203
Dear Dr. Miller:
I am in receipt of your letter of August 7, 1979 in which you request an opinion regarding the effect of House Bill No. 1474 on the operation of commercial dental laboratories. House Bill No. 1474 (H.B. 1474) contains amendments to the Dental Practice Law of Colorado (DPL), C.R.S. 1973, 12-35-101 et seq., added by the Colorado legislature when the DPL came before the legislature for "Sunset" review.
QUESTION PRESENTED AND CONCLUSION
You request for an attorney general's opinion presents the following question:
1. Does House Bill 1474 prohibit or limit commercial dental laboratories?
My conclusion is "no."
ANALYSIS
This whole area has been a matter of considerable concern in the attorney general's office and has been the subject of research and analysis by members of my staff. Even prior to the enactment of the H.B. 1474 amendments, the DPL contained certain provisions which made the status of commercial dental laboratories somewhat ambiguous.
The tasks and procedures commonly performed by commercial dental laboratories, as such tasks and procedures are described in C.R.S. 1973, 12-35-130(1), are included within the statutory definition of proprietor, C.R.S. 1973, 12-35-103(5)(b) and (c). Such proprietor is engaged in the practice of dentistry by statute, C.R.S. 1973, 12-35-110(1)(b), although the exemption contained in C.R.S. 1973, 12-35-111(g) apparently is designed to exempt the operation of commercial dental laboratories from the civil and criminal penalties which might otherwise be incurred under the statute.
H.B. 1474 amends C.R.S. 1973, 12-35-125 and provides specific limitations on the practice of dental auxiliaries in the area of providing full and partial dentures to consumers. The bill requires that the dental auxiliary must, in addition to working under the personal direction of a licensed dentist, ensure that the patient is examined a specific number of times by such dentist when a full denture is constructed for the patient. The bill also states that authorized dental tasks and procedures may be performed only in the office of a licensed dentist, but does not require that the dental auxiliary work pursuant to a written laboratory work order (LWO) signed by a licensed dentist when constructing full dentures.
There are apparent conflicts between C.R.S. 1973, 12-35-125 (as amended by H.B. 1474), 12-35-111(g) and 12-35-130. Subsection 111(g) states that acts performed pursuant to subsection 130 are exempt from any other provision of the DPL. Subsection 130 states that any licensed dentist who utilizes the services of an unlicensed person (which includes dental auxiliaries since they are not licensed in the State of Colorado) for the purpose of constructing, altering, repairing, or duplicating any denture, plate, partial plate, bridge, splint, or orthodontic or prosthetic appliance must provide such person with a laboratory work order signed by such dentist for each separate and individual piece of work. H.B. 1474 provides pursuant to C.R.S. 1973, 12-35-125(4)(a), that many of the dental tasks or procedures described in 12-35-130 may also be performed by a dental auxiliary, but subsection 125(4)(a) does not state that a LWO is required to authorize the dental auxiliary to perform such tasks and procedures.
The aforementioned provisions of the DPL (including the H.B. 1474 amendment) are subject to varying statutory interpretations and raise several questions (i.e., must a dental auxiliary, performing dental tasks and procedures pursuant to C.R.S. 1973,12-35-125, obtain a LWO prior to performing such tasks and procedures; and, must unlicensed individuals or commercial dental laboratories, performing dental tasks and procedures pursuant to C.R.S. 1973, 12-35-130, perform such tasks and procedures under the personal direction of a licensed dentist in such dentist's office pursuant to C.R.S. 1973, 12-35-125). When a statute is ambiguous or susceptible to more than one interpretation, the constitutional interpretation and that interpretation which favors the public interest over any private interests must be chosen, thereby avoiding or minimizing the restriction of the availability of quality dental services to the consumer. 2A Sands, Sutherland's Statutory Construction, section 45.11 (1973 ed.), and C.R.S. 1973, 2-4-201 and 203. See alsoColorado State Board of Medical Examiners v.Jorgensen, No. 28353 (Colo. Aug. 20, 1979) at 5-6.
A narrow interpretation of H.B. 1474 not only meets the fundamental principles of statutory construction, but also promotes the public interest in a competitive market place for dental services. The paramount importance of that public interest is recognized in federal and state antitrust laws which have been described by the United States Supreme Court as the "Magna Carta of free enterprise." United States v.Topco Associates, 405 U.S. 596, 610 (1972). As the court observed:
 / The antitrust laws / are as important to the preservation of economic freedom and our free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete — to assert with vigor, imagination, devotion and ingenuity whatever economic muscle it can muster.
In light of this overriding public policy (which favors competition whenever possible), the courts have been reluctant to exempt from the antitrust laws any anticompetitive statute or regulation except in certain, limited circumstances. (SeeU.S. v. Philadelphia National Bank, 374 U.S. 321,350-51 (1963) "Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored;" City ofLafayette v. La. Power Light Co., 435 U.S. 389,399 (1978) "Antitrust laws will not be displaced unless it appears that the antitrust laws and regulatory provisions are clearly repugnant.") Therefore, I believe that the board should be cognizant of the fact that any action it takes (which could be construed as anticompetitive) will be tested by the vigorous standard of competition embodied in the antitrust laws.
As one antitrust commentator has said:
 State displacement will be sanctioned only when the state has made a legislative judgment to adopt a cohesive regulatory program alternative to antitrust and only to the extent needed to give that policy the scope which it requires.
Sullivan, Handbook on Antitrust, 735 (1978).
The question of the extent of a "state action" exemption from the antitrust laws under H.B. 1474 impacts on at least two levels — the regulatory body (i.e., dental board) and those individuals affected by the regulation (i.e., dentists, hygienists, auxiliaries). The courts have discussed the exemption at both levels and concluded that it will only be recognized in very limited circumstances.
The starting point for the "state action" exemption isParker v. Brown, 317 U.S. 341 (1943) which upheld a California program regulating the marketing of raisins even though the program restricted competition among growers and maintained prices. The court in Parker emphasized the fact that the state's program "derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command"317 U.S. at 350.
More recently, in City of Lafayette v. La. Power and LightCo., 435 U.S. 389 (1978), the Supreme Court further defined the doctrine of exemption by state action. Justice Brennan noted:
 / (T)he Parker doctrine / exempts only anticompetitive conduct engaged in as an act of government by the state as sovereign . . . pursuant to state policy to displace competition with regulation or monopoly public service.
435 U.S. at 412.
This narrow view of the state action exemption was recently upheld by the Fifth Circuit Court of Appeals in UnitedStates v. Texas State Board of Accountancy,464 F. Supp. 400 (D. Tex. 1978), modified and aff'd 592 F.2d 919
(5th Cir. 1979), cert. filed, Dkt. No. 78-1811. In that case, the United States Department of Justice sued the Texas State Board of Accountancy ("board") to enjoin alleged violations of section 1 of the Sherman Act. The board (comprised of nine licensed accountants appointed by the governor of the state) was authorized by statute to adopt rules and regulations. The board had promulgated a rule prohibiting competitive bidding by accountants pursuant to a provision in the Texas statute which allowed the board to "promulgate and amend Rules of Professional Conduct to establish and maintain a high standard of integrity." The Fifth Circuit affirmed the district court's finding that the rule clearly violated the Sherman Act, that a combination and conspiracy existed, and that the board was not immune under Parker v. Brown since the rule adopted was not mandated by any state regulation or action.
The district court then entered the injunction and awarded costs of suit to the plaintiff. Although that case has only recently been filed with the Supreme Court, the principle of narrow construction of the state action exemption should be given careful consideration by every state agency. Thus, if the dental board were to consider adopting any regulations which might expand upon H.B. 1474, and thereby limit competition in the field of dental services, the board could be denied the state action exemption from the application of the antitrust laws.
The second level affected by the "state action exemption" consists of private parties who follow the mandate of a statute and any rules or regulations interpreting that statute. At this level, the state action exemption is subject to an even more rigorous standard. Although the board itself is not necessarily affected at this level, certainly each and every one of the persons it regulates is concerned. In the time since Parkerv. Brown, several Supreme Court decisions have addressed the question of immunity for private parties who have allegedly acted pursuant to state action.
In Goldfarb v. Virginia State Bar, 421 U.S. 773 (1975), the court held that the Parker doctrine would not protect private anticompetitive conduct which, although consistent with state regulation, was not required by the state. There, the state bar association had established minimum fee schedules and argued that the schedule was "prompted" by the state supreme court which had delegated enforcement responsibility to the state bar. The Supreme Court of the United States rejected the argument and held that in order for the state action exemption to apply "anticompetitive conduct must be compelled by direction of the state acting as sovereign."421 U.S. at 971.
One year later in Cantor v. Detroit Edison Co.,428 U.S. 579 (1976) the Supreme Court went on to say that:
 State authorization, approval, encouragement, or participation in restrictive private conduct confers no antitrust immunity.
428 U.S. at 592.
In Cantor, the court held an electric utilities' practice of distributing free light bulbs subject to antitrust attack even though the Michigan Public Service Commission had approved the practice. While no clear standard emerged fromCantor (four opinions and no opinion garnered more than four votes), the court evidenced its conviction that essentially private conduct should not be immunized under the guise of state regulation.
In light of the foregoing, I would be especially concerned if the board were to limit auxiliaries or commercial dental laboratories any further than H.B. 1474 specifically provides. Moreover, those persons regulated by the board may have a difficult time securing a safe harbor for themselves if they use the statute or board rules and regulations to accomplish an anticompetitive purpose. I would conclude that H.B. 1474 is limited both by its terms and by its relationship to the pro-competitive policies embodied in the antitrust laws. Any expanded reading of the statute towards anticompetitive ends or effects should be studiously avoided.
SUMMARY
It is my opinion therefore that dental auxiliaries, since they are unlicensed persons subject to the provisions of C.R.S. 1973,12-35-130, must be furnished with a LWO prior to the performance of any task or procedures described in 12-35-130. However, no LWO is required when such auxiliary is performing tasks or procedures described in 12-35-125 which are not also described in12-35-130. In addition, it is our opinion that the H.B. 1474 amendments do not require that unlicensed persons or commercial dental laboratories, performing dental tasks and procedures in accordance with 12-35-130(1), work under the personal direction of a licensed dentist or in the "regularly announced office location" of such dentist. Such an interpretation of the H.B. 1474 amendments might serve to overly restrict the providing of dental services to consumers and as such would not be in the public interest.
Please be advised that I am not expressing an opinion as to whether the H.B. 1474 amendments are in the best interest of the public. This opinion, written in answer to your request of August 7, 1979, describes the legal effect of the H.B. 1474 amendments upon the operation of commercial dental laboratories, and comments upon the possible antitrust implications or anticompetitive effect of the promulgation of rules and regulations which expand upon the provisions of H.B. 1474.
Very truly yours,
 J.D. MacFARLANE Attorney General DENTISTS AND DENTISTRY STATUTES STATUTORY CONSTRUCTION STATUTORY REVISION
C.R.S. 1973, 12-35-125(4) C.R.S. 1973, 12-35-111(1)(g) C.R.S. 1973, 12-35-130
REGULATORY AGENCIES, DEPT. Dental Examiners, Bd. of
Dental laboratory construction of dentures pursuant to laboratory work orders of licensed Colorado dentists are not prohibited by the Dental Practice Law of Colorado. Such dental functions involve no diagnosis, prescription, or analytical design by laboratory personnel and are exempt from direct regulation under the dental practice law.