The HERTZ CORPORATION,
Plaintiff–Appellant,

v.

The CITY OF NEW YORK, O. Peter Sherwood, in his official capacity as Corporation Counsel of the City of New York, and Mark Green, in his official capacity as Commissioner of Consumer Affairs of the City of New York, Defendants–Appellees.

No. 1592, Docket 92–7369.

United States Court of Appeals,
Second Circuit.

Argued May 6, 1992.

Decided Aug. 2, 1993.

Paul C. Saunders, New York City (Cravath, Swaine & Moore, of counsel), for plaintiff-appellant.

Alan G. Krams, New York City (O. Peter Sherwood, Corp. Counsel of the City of New York, Leonard Koerner, Lawrence S. Kahn, Barry P. Schwartz, June R. Buch, Julie Mertus, of counsel), for defendants-appellees.

Timothy Dyk, Washington, DC (Jones, Day, Reavis & Pogue, of counsel), for amicus curiae Chamber of Commerce of the U.S.

Before: FEINBERG, PRATT and McLAUGHLIN, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Hertz Corporation appeals from a judgment of the United States District Court for the Southern District of New York, Whitman Knapp, *Judge*, that dismissed its complaint which sought to enjoin enforcement of Local Law No. 21 of 1992 of the City of New York, referred to informally as the "Hertz law".

## FACTS AND BACKGROUND

On January 2, 1992, Hertz announced that it would increase the daily car-rental rates it charges by $56.00 for residents of the Bronx, $34.00 for residents of Brooklyn, $3.00 for residents of Manhattan, and $15.00 for resi-

dents of Queens. The increased rates were to be charged to persons residing in those four boroughs whenever they rented a car at a Hertz outlet in the New York metropolitan area, New Jersey, Southern Connecticut, or Eastern Pennsylvania. Out-of-city Hertz customers who rented a vehicle in one of these four boroughs would have no increased rates.

Hertz claims that renting cars to residents of these boroughs had resulted in extremely high liability expenses for the company. Specifically, Hertz alleges that although only about seven percent of Hertz's nationwide rentals occur in the New York area, more than 25 percent of its liability losses have occurred there. As one of the reasons, the company points to a state statute that holds car owners vicariously liable for any monetary damages caused by the operation of their vehicles. *See* N.Y.Veh. & Traf. § 388 (McKinney 1986). Another cause, says Hertz, is that juries in some of the affected boroughs have a history of awarding high damages to plaintiffs in personal injury cases. Hertz avers that its residency surcharges correspond directly to the average excess liability losses incurred per rental in the affected boroughs.

Hertz excludes several groups of renters from the increases: (1) those holding contracts with Hertz, such as federal and corporate accounts, and (2) certain other categories of renters—those possessing airline tickets, members of the Manhattan Preferred Renters Club, and Platinum Service customers—felt to be low-risk groups. In addition, members of the "Hertz Gold Club" are excluded, since they do not check in at a rental-car outlet and therefore could not practicably be notified of the increased rate. Hertz also has announced a "Responsible Renter Qualification Program", which permits those otherwise subject to the increased rates to apply for and receive an exemption upon meeting certain qualifications, including a safe driving record.

In response to Hertz's proposed surcharges for residents of four of its boroughs, the City of New York passed Local Law No. 21 of 1992 which amended chapter four of title 20 of the city's administrative code to provide that:

No rental vehicle company shall refuse to rent a motor vehicle to any person otherwise qualified based on that person's residence, nor impose fees or charges based on that person's residence.

Through this local law, the city contends, that it was "exercising its reasoned legislative judgment that the social costs of the [Hertz pricing] practice are too high, given its potential for polarization and the fact that the burden falls hardest on minorities and the working poor."

In addition to enacting Local Law No. 21, the city commenced an action in Supreme Court, New York County, claiming that Hertz's rate increases violated (1) state and local law because of their disparate impact on minorities, and (2) section 396–z(10) of New York's General Business Law. That action is pending.

On March 27, 1992, Hertz commenced this action in the United States District Court for the Southern District of New York. It sought a declaratory judgment that the Hertz law is invalid and an injunction against its enforcement. The complaint alleged that Local Law No. 21(1) is preempted by state law regulating the rental-car industry, and (2) violates several provisions of the United States Constitution: (a) the contract clause, (b) the commerce clause, and (c) the fourteenth amendment's protection for substantive due process and its prohibition against uncompensated takings. Finally, Hertz charged that Local Law No. 21 compels a violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1988), and therefore is preempted and invalid under the supremacy clause of the United States Constitution.

Four days after it was filed, Hon. Whitman Knapp, ordered Hertz's complaint dismissed, but he enjoined the city from taking any action to effectuate the law pending the outcome of any appeal by Hertz. Hertz appealed the dismissal; the city did not cross-appeal.

Because the determination of Hertz's state-law preemption claim involved issues that were important to the continuing devel-

opment of state law and potentially dispositive of this appeal, on June 10, 1992, we certified to the New York State Court of Appeals the question of "whether New York State legislation addressing car rental practices sets forth a sufficiently comprehensive scheme of regulations to preempt further legislation in the field by the municipalities of the state." *Hertz v. City of New York*, 967 F.2d 54, 57 (2d Cir.1992). On December 22, 1992, the Court of Appeals answered this question in the negative. *See Hertz v. City of New York*, 80 N.Y.2d 565, 592 N.Y.S.2d 637, 607 N.E.2d 784 (1992).

The case is now before us to review the district court's resolution of the remaining issues: (1) the city's antitrust liability under the Sherman Act, (2) the impact of Local Law No. 21 on interstate commerce, and (3) Hertz's claims under 42 U.S.C. § 1983 (1988) based on takings law, the contract clause, and substantive due process.

## DISCUSSION

■ Review of the grant of a motion under Fed.R.Civ.P. 12(b)(6) is *de novo*, and we must construe in Hertz's favor factual allegations in the complaint. *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). Our consideration, like the district court's, is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken. *Id.* Dismissal of the complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted).

### A. *The Sherman Act.*

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal." 15 U.S.C. § 1.

■ Initially we note that by controlling one aspect of the pricing process for rental cars, the Hertz law on its face restrained trade within the meaning of § 1 of the Sherman act. *See National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) ("Price is the 'central nervous system of the economy,' and an agreement that 'interfere[s] with the setting of price by free market forces' is illegal on its face."). In *National Soc'y of Professional Eng'rs*, the Supreme Court concluded that an agreement among competitors to refuse to discuss prices with potential customers until after negotiations had resulted in the selection of an engineer restrains trade within the meaning of § 1 of the Sherman Act. The Court aptly noted, "[w]hile this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *Id.* at 692, 98 S.Ct. at 1365. The agreement impeded the ordinary give and take of the market place. *Id.*

■ The fact that Local Law No. 21 does impose a restraint on trade only marks the beginning of our analytical journey, however, because the broad language of the Sherman Act precludes only those restraints of trade that are unreasonable. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1518, 99 L.Ed.2d 808 (1988); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984); *see generally* Earl W. Kintner, 2 *Federal Antitrust Law* § 9.20, at 56 (1980). Unreasonable contracts, combinations, and conspiracies in restraint of trade enacted by state and local governments are unconstitutional as preempted by federal antitrust laws. *See generally* Phillip E. Areeda and Donald F. Turner, *Antitrust Law* ¶ 209, at 60 (Supp.1992).

■ The threshold requirement of the statute is that there be a "contract, combination, * * * or conspiracy" to restrain trade or commerce. This element of the statute is usually clear when the conduct at issue is that of private parties; however, when the actor is a local governmental unit, two additional questions must be answered. The first arises from the Supreme Court's holding in

*Fisher v. City of Berkeley,* 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986), that in some circumstances, discussion of which follows, action by a city may not be a contract, combination, or conspiracy at all. *Id.* at 266–68, 106 S.Ct. at 1049–50. The second additional question addresses the extent to which the local governmental unit may be entitled to share in the immunity from antitrust liability that is accorded state actors, a topic that need be addressed only if we conclude that the challenged action conflicts with antitrust laws. *Id.* at 264, 106 S.Ct. at 1047. Finally, although courts have deemed some restraints so anticompetitive that they are held *per se* invalid, the presumption is that restraints are examined in light of the rule of reason—a more flexible standard that demands consideration of a variety of factors. Thus, we must also consider the appropriate standard by which to measure the reasonableness of the city's action.

The antitrust issues we must address, therefore, can be summarized as follows: (1) whether there is a contract, combination or conspiracy, (2) whether the city enjoys state-action immunity from antitrust liability, (3) the possible applicability of *per se* analysis to the city's law, and finally, (4) whether the rule of reason is the appropriate measure of Sherman Act liability for this municipal defendant. We will discuss each issue as applied to Local Law No. 21.

### 1. Contract, Combination, or Conspiracy.

■ The Supreme Court addressed the issue of municipal antitrust liability in *Fisher,* where the City of Berkeley had promulgated a rent-control ordinance that was administered by an independent, quasi-judicial board. The board calculated the annual, general rent adjustments and processed individual claims for variances. Opponents of the ordinance argued that it required price-fixing that, under the traditional standards, was a *per se* unreasonable restraint of trade. The Supreme Court rejected this proposed analysis, and instead held that, on the facts before it, the city's action was not "concerted"—it did not meet the threshold requirement of being a contract, combination, or conspiracy. This was so because "[t]he rent

ceilings imposed by the [city] Ordinance and maintained by the Rent Stabilization Board have been unilaterally imposed by government upon landlords to the exclusion of private control." *Fisher,* 475 U.S. at 266, 106 S.Ct. at 1049. Thus, the Court held the Berkeley ordinance to be a "unilateral action outside the purview of § 1." *Id.* at 266–67, 106 S.Ct. at 1049.

The Court then re-examined its two earlier cases that had addressed governmental antitrust liability. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). Despite the lack of an agreement between any of the regulated parties, the Supreme Court found in both *Midcal* and *Schwegmann Bros.* that the pertinent state statute called for private industry to engage in price-fixing, which the court held to be *per se* illegal. The *Fisher* Court explained that the factor distinguishing *Midcal* and *Schwegmann Bros.* was the role played by the governmental body in implementing the legislation. In both cases, the state had dictated price-setting that was to be performed not by the state, but by wholesalers and producers in the liquor industry.

The *Fisher* Court explained:

Not all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of § 1. Certain restraints may be characterized as "hybrid," in that non-market mechanisms merely enforce private marketing decisions. Where private actors are thus granted "a degree of private regulatory power," the regulatory scheme may be attacked under § 1.

475 U.S. at 267–68, 106 S.Ct. at 1049–50 (citations omitted).

*Fisher* can be read to require us to examine first whether Local Law No. 21 qualifies as a "unilateral" restraint; if it does it falls outside § 1 of the Sherman Act, because it is not a "contract, combination * * * or conspiracy." In dismissing Hertz's Sherman Act claim, the district court adopted the city's view that the local law was a unilateral municipal action.

The Hertz law, however, lacks several features of the "unilateral" Berkeley ordinance. First, the law is not a "pure regulatory scheme", *Fisher*, 475 U.S. at 269, 106 S.Ct. at 1050, because it is not a "scheme" at all; the law is simply a directive for all rental-car companies doing business in New York City to remove one factor from their competitive-pricing structures. Second, the law lacks the independent, quasi-judicial board that in *Berkeley* could adjust rates and provide relief in individual circumstances. Finally, the City of Berkeley was operating in an area vital to its municipal authority—housing; less vital is the rental-car industry in New York City.

Nor does the Hertz law easily fit the fact pattern of the cases held to involve "hybrid" restraints—those that restrain trade through some combination of governmental and private conduct. The three Supreme Court cases in this category involved the pricing of liquor. *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987); *Midcal*, 445 U.S. 97, 100 S.Ct. 937; *Schwegmann Bros.*, 341 U.S. 384, 71 S.Ct. 745. Each involved classic price-setting that was delegated by statute or regulation to private industry but was left unsupervised by the state legislature. The Hertz law, in contrast, does not purport to authorize price-setting by private industry; it simply eliminates an element of price competition among industry members.

We reject the city's suggestion to apply *Fisher* expansively so as to view Local Law No. 21 as a unilateral action that lacks the degree of private-governmental agreement required to be a contract, combination, or conspiracy in restraint of trade. To do so would remove from the reach of the antitrust laws all local governmental actions not fitting the precise fact pattern of the liquor cases, and would preclude examination of their anti-competitive effects. At the same time, we also reject Hertz's contention that this case, like the "hybrid" liquor cases, presents a straight-forward example of price-fixing that is *per se* invalid.

Present here are several anticompetitive risks, gleaned from the Supreme Court's antitrust jurisprudence, that might warrant antitrust scrutiny for this municipal entity. The Hertz law may permit the city to impose on an industry unnecessary monetary costs that will have an extraterritorial impact. *See, e.g., City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 405, 98 S.Ct. 1123, 1132, 55 L.Ed.2d 364 (1978) (plurality). The law may also obstruct regional efficiency and trigger economic Balkanization, because of the possibility that many independent local governments may follow suit and consequently distort the national market economy. *Id.* at 404, 408, 98 S.Ct. at 1132, 1134.

In short, while we have found no case dealing with a governmental act having attributes similar to the Hertz law, we conclude that the Hertz law is not a "unilateral" restraint. It is closer to, although not identical with, those actions categorized as "hybrid", because it removes one element of competition in car-rental pricing, but does not further regulate or review the prices set by rental companies. In addition, some of the risks of anticompetitive behavior enunciated in *City of Lafayette* and relied on in *324 Liquor Corp.* are present in Local Law No. 21.

Accordingly, we disagree with the district court's conclusion that the Hertz law is a unilateral restraint that lacks the requisite contract, combination, or conspiracy to warrant antitrust review. Local Law No. 21 calls for anticompetitive private conduct in setting rental rates and making rental decisions. The law thus merits hybrid treatment; however, we must first determine whether the city has pointed to sufficient state involvement in the enactment of Local Law No. 21 to entitle it to state-action immunity.

2. *State–Action Immunity from Antitrust Liability for Municipality.*

■ Having determined that the Hertz law is a contract, combination, or conspiracy in restraint of trade, we now turn to the issue of whether New York State has cloaked the City of New York with immunity for any antitrust violations created by the Hertz law. *Fisher*, 475 U.S. at 264, 106 S.Ct. at 1047 (consideration of state-action immunity un-

necessary unless actual conflict with antitrust laws is established).

■ The Supreme Court in *Parker v. Brown* held that the Sherman Act does not apply when anticompetitive restraints are imposed by the states "as an act of government". 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943). Under principles of federalism and state sovereignty, a state actor is accorded absolute immunity from antitrust liability. *See City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).

Local governments may be entitled to state-action immunity. While *Parker* state-action immunity does not apply directly to *local* governments, a municipality's restriction of competition may sometimes be an authorized implementation of state policy; if it is, then the municipality may share in the immunity accorded to state actions. *City of Lafayette*, 435 U.S. at 413, 98 S.Ct. at 1136 (municipal government shares in *Parker* immunity if its activity was pursuant to state policy to displace competition with regulation or monopoly public service).

The Supreme Court in *FTC v. Ticor Title Insurance Co.* reiterated the "two-part test applicable to instances where private parties participate in a [local government's] price fixing regime. 'First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the policy must be actively supervised by the State itself.'" — U.S. ——, ——, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992) (quoting *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943).

■ Thus, a municipality may benefit from the "state action" exemption only if it has acted pursuant to a clearly articulated state policy. *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 52, 102 S.Ct. 835, 841, 70 L.Ed.2d 810 (1982) (plurality); *324 Liquor Corp.*, 479 U.S. at 343–45, 107 S.Ct. at 724–26. As we held in an analogous Clayton Act context:

The clarity of such [articulated state] policy is often a function of how broadly the legislation is drawn, with the existence of such policy being more readily discernible in narrowly drawn legislation. The legislation must contain an affirmative showing of intent, though it need do ·no more than authorize the challenged conduct. So long as the resulting anti-competitive activities are a foreseeable consequence of the state delegation, the "clear articulation" standard has been met. To meet this requirement the party claiming the state action defense must show that the "legislature contemplated the action complained of." "[A]ctive state supervision"—is no longer required in the case of a municipality.

*Cine 42nd St. Theater Corp. v. Nederlander Org.*, 790 F.2d 1032, 1043 (2d Cir.1986) (citations omitted).

The State of New York has not granted New York City any particular authority over the car-rental field; instead the Hertz law represents an exercise of the city's home-rule powers granted by the state constitution and statutes. *See* N.Y. Const. art. IX, § 2(c)(i) (McKinney 1987) ("[E]very local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to its property, affairs or government"); Municipal Home Rule Law § 10 (McKinney 1969). The Supreme Court has held that a similar home-rule provision in the Colorado state constitution reflected the state's position of "mere *neutrality*" regarding local activities undertaken pursuant to that provision. *Community Communications Co.*, 455 U.S. at 55, 102 S.Ct. at 842 ("A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought.").

■ Thus, local government actions that are grounded in home-rule authority are not carried out pursuant to a clearly articulated state policy. *See also Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Cine 42nd St.*, 790 F.2d 1032. In adopting Local Law No. 21 the City of New York did not operate from any clearly articulated state policy that encourages or foresees anti-competitive activity in the rental-car field. *Cf. Cine 42nd St.*, 790 F.2d at 1043–44; *see also Montauk–Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 95 (2d

Cir.) (citing *Town of Hallie*, 471 U.S. at 38, 105 S.Ct. at 1716), *cert. denied*, 479 U.S. 872, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986).

█ We conclude, therefore, that in this challenge to Local Law No. 21, New York City is not protected by state-action immunity from antitrust liability. We recognize that when a state or local governmental action compels *private* anticompetitive behavior, state-action immunity would additionally require a showing that the state actively supervised that private conduct. *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943. However, because we have determined that the lack of a clear state policy directing the city's legislative efforts prevents the city from enjoying state-action immunity here, we need not further address the active-supervision question.

Having determined, based on the allegations of the complaint, that the Hertz law comes closest to being a "hybrid" restraint, *i.e.*, a contract, combination, or conspiracy in restraint of trade, involving the city and the car-rental industry, and that the city has no state-action immunity, we must reverse the district court's dismissal of the complaint and remand for further analysis of the remaining antitrust issues. To assist the parties and the district court on the remand, we set forth some guidance for some of the problems that remain in this difficult case.

3. *Per Se Analysis.*

█ A *per se* rule is used in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue. *Broadcast Music Inc. v. Columbia Broadcasting Sys. Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979); *see also Business Elecs.*, 485 U.S. at 723, 108 S.Ct. at 1518 (*per se* rule appropriate only for manifestly anticompetitive conduct that would almost always tend to restrict competition and decrease output); *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 107–08, 104 S.Ct. 2948, 2963, 82 L.Ed.2d 70 (1984) (court reluctant to extend *per se* analysis where economic impact of challenged practice not immediately obvious). For example, an agreement to fix prices is invalid regardless of any offer of proof to establish that the resulting price is reasonable. *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *see also Schwegmann Bros.*, 341 U.S. at 385–86, 71 S.Ct. at 746; *Catalano Inc. v. Target Sales Inc.*, 446 U.S. 643, 648, 100 S.Ct. 1925, 1928, 64 L.Ed.2d 580 (1980) (per curiam) (agreements between private competitors to eliminate discounts is *per se* an illegal price fixing scheme).

█ Hertz argues that this case is sufficiently akin to horizontal price fixing to warrant *per se* treatment. We disagree. The setting is inappropriate for *per se* analysis. Not only have courts had little exposure to issues surrounding efforts by local governments to restrain trade through regulation, but this particular effort involves the novel claim by the city that the local law promotes a non-economic objective: the virtue of anti-discrimination.

Moreover, this case cannot be easily grouped with previous cases: it is not a rate-setting case, *see, e.g., Ticor Title Ins. Co.*, —— U.S. at ——, 112 S.Ct. at 2169 and *Fisher*, 475 U.S. 260, 106 S.Ct. 1045, as the law does not set a maximum or minimum price for rental cars in New York City; nor is it a zoning case, *see, e.g., Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); a licensing case, *see, e.g., Broadcast Music, Inc.*, 441 U.S. 1, 99 S.Ct. 1551 and *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 77 S.Ct. 490, 1 L.Ed.2d 465 (1957); or a franchise-granting case, *see, e.g., Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Finally, and most significantly, the Supreme Court has specifically suggested that *per se* treatment may not be well tailored to assessing municipal antitrust liability, noting that "certain activities which might appear anticompetitive when engaged in by private parties, take on a different complexion when adopted by a local government." *Community Communications Co.*, 455 U.S. at 56 n. 20, 102 S.Ct. at 843 n. 20 (quoting *City of Lafayette*, 435 U.S. at 417 n. 48, 98 S.Ct. at 1138 n. 48).

In short, we do not think it wise to adopt in this case, a restrictive *per se* rule that would require automatic invalidation of a local government's duly-passed legislation, without regard to the circumstances prompting its enactment.

#### 4. *Rule-of-Reason.*

We next consider the applicability of the rule of reason to the Hertz law.

Ordinarily, whether particular concerted action violates § 1 of the Sherman Act is determined through case-by-case application of the so-called rule of reason—that is, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."

*Business Elecs.,* 485 U.S. at 723, 108 S.Ct. at 1518 (citation omitted).

■■■ The traditional rule-of-reason approach requires the defendant to demonstrate that the procompetitive aspects of the agreement outweigh its anticompetitive aspects.

[The Rule of Reason] has been used to give the [Sherman] Act both flexibility and definition, and its central principle of antitrust analysis has remained constant. Contrary to its name, the Rule does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions.

*National Soc'y of Professional Eng'rs,* 435 U.S. at 688, 98 S.Ct. at 1363.

Agreements subject to a rule-of-reason analysis have traditionally been evaluated for their competitive effect by

analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed. * * *. [T]he purpose of the analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to ex-

ceptions defined by statute, that policy decision has been made by the Congress.

*Id.* at 692, 98 S.Ct. at 1365 (footnote omitted).

" 'The factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.' " *Business Elecs.,* 485 U.S. at 723, 108 S.Ct. at 1518 (quoting *Continental T.V., Inc.,* 433 U.S. at 49, 97 S.Ct. at 2557).

Significantly, none of these rule-of-reason cases has involved a challenge to restraints on competition imposed by municipal activity. Application of the rule to this emerging legal field will require considerable tailoring to achieve even an approximate fit.

■■■ Under the rule-of-reason approach, the district court must balance the city's articulated justifications for promulgating the anticompetitive regulation against the antitrust harm caused by the regulation. *National Soc'y of Professional Eng'rs,* 435 U.S. at 688, 98 S.Ct. at 1363; *accord National Collegiate Athletic Ass'n,* 468 U.S. at 104, 104 S.Ct. at 2961 (under Sherman Act, one must judge validity of restraint on trade according to its impact on competition). The legality of the city's restraint on trade must be determined by weighing all the relevant factors—including the history of the restraint, and the evil to be prevented, *see, e.g., Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (rule of reason requires weighing of relevant circumstances of case); *United States v. National Soc'y of Professional Eng'rs,* 404 F.Supp. 457, 460–61 (D.D.C.1975) (same); the history and practices of the relevant industry, *see, e.g., Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984) (inquiry into market power and market structure necessary to gauge combination under rule-of-reason approach); *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 343–44, 102 S.Ct. 2466, 2472–73, 73 L.Ed.2d 48 (1982) (same); the local government's reasons for adopting the particular restraint; and the end sought to be attained, *see Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1571 (5th Cir.1984) (en

banc) (Higginbotham, *J.*, concurring) (adaptation of rule of reason to anticompetitive local governmental conduct requires courts to consider factors not traditionally within rule, including above listed factors). Accordingly, the district court may consider the city's articulated concern of avoiding nondiscrimination by ensuring that Hertz's pricing and rental decisions do not burden minorities and the working poor. This places into the economic scale of traditional antitrust analysis noneconomic federal values embodied in the thirteenth and fourteenth amendments as well as in many of the federal statutes. We think consideration of such a federal policy is appropriate within the rule-of-reason analysis as it is applied to a municipality.

Hertz, of course, is entitled on remand to present evidence disputing the validity and strength of the city's justifications for this anticompetitive regulation. The city's justifications must be assessed in light of its stated end; this makes relevant Hertz's explanation for its price increase—specifically, its claim to have experienced exceedingly high liability losses in certain boroughs. The city's history of negotiating with Hertz concerning what it felt to be an objectionable pricing policy is relevant, as is Hertz's consideration of less burdensome pricing methods. For example, the court may find relevant the city's contention that Hertz could recoup its losses by raising each renter's fee by $3.29 in the New York region.

In conclusion, on the antitrust issue, we remand to the district court for further proceedings.

### B. *Commerce Clause.*

 Hertz also contends that Local Law No. 21 impermissibly burdens interstate commerce. *See* U.S. Const. art. I § 8 cl. 3. The constitution's affirmative grant to congress of powers over interstate commerce means that states have limited authority to erect barriers against interstate trade, *see Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 2014, 64 L.Ed.2d 702 (1980), a limitation that applies equally to municipal legislation. *Dean Milk v. City of Madison,* 340 U.S. 349, 356, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). Hertz alleged that the city's local law violates the commerce clause "to the extent that the Hertz Law effectively forces Hertz to raise its rental rates to residents of other states * * *." Hertz outlines in its complaint and other papers several means by which it might comply with Local Law No. 21 and still avoid being overwhelmed by the increased costs of renting to city residents. The corporation could (1) cease entirely its operations in New York City; (2) raise its rates for out-of-state residents who rent in the New York area; or (3) raise rental rates in other states.

The district court rejected this commerce-clause claim. Judge Knapp found that Hertz has the additional option of raising its rates evenly throughout all of New York City, or "finding other ways of dealing with the problem". These options, said the district court, take the sting out of the alleged injury to interstate commerce.

To make out a claim that this regulation impermissibly burdens the commerce clause, Hertz must sufficiently plead that the local law discriminates against interstate commerce either on its face, or in its effect. *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). Local Law No. 21 does not burden out-of-state customers expressly; it states only that rental-car companies may not "impose fees or charges based on [a] person's residence." Since the law does not facially burden interstate commerce, it must be upheld unless the actual burden it "impose[s] on interstate trade [is] 'clearly excessive in relation to the putative local benefits' ". *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

In its complaint, Hertz has not sufficiently alleged that Local Law No. 21 has a discriminatory impact on interstate commerce. First, Hertz does not allege that an *inter*state effect must flow from this *intra*state municipal regulation. Second, Hertz does not define what significant burden on interstate commerce is posed by Local Law No. 21. Hertz itself tells us that it can comply with the local law and maintain its profit level in New York City through a range of

options, not all of which impact interstate commerce. Thus, Hertz has yet to explain how the city's car-pricing ordinance compels action that discriminates against interstate commerce.

Of course, there was little time available in the district court proceedings to fully explore the implications of Hertz's commerce-clause argument. Only four days elapsed between the filing of the complaint and the district court's order dismissing the complaint. Since this case must be remanded for the district judge to apply a rule-of-reason analysis to Hertz's Sherman Act claim, Hertz should have the opportunity, if it so desires, to develop further its contentions with respect to the law's impact on interstate commerce.

### C. *Remaining Claims.*

Judge Knapp also dismissed Hertz's remaining contentions that Local Law No. 21 violates 42 U.S.C. § 1983 because it (1) is an unconstitutional regulatory taking, (2) impermissibly impairs existing contracts, and (3) offends principles of substantive due process.

### 1. *Regulatory Taking*

■ Hertz has failed to state a claim that Local Law No. 21 imposes a regulatory taking in violation of the fourteenth amendment. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (regulation of property which goes too far may amount to taking). Even assuming that takings cases connected with the diminution of real estate values apply in this business setting, the local law does not effect a taking because Hertz and other rental-car companies retain the right to set rates in New York City at any level they desire. *See, e.g., Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 818 (1978) (per curiam) (not every deprivation of use, possession, or control is "taking"; character and extent of interference must be examined). Hertz unquestionably retains an "economically viable" use of its property, *see, e.g., Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 127, 138 n. 36, 98 S.Ct.

2646, 2660, 2666 n. 36, 57 L.Ed.2d 631 (1978), and finally, the taking cases offered by Hertz relating to the public-utility industry do not apply here. *See Duquesne Light Co. v. Barasch,* 488 U.S. 299, 306–08, 109 S.Ct. 609, 614–15, 102 L.Ed.2d 646 (1989) (defining constraints posed by takings clause on state-rate regulation of public utility).

### 2. *Impairment of Contract.*

Hertz alleged that application of Local Law No. 21 to car-rental contracts in place before it takes effect would unconstitutionally impair those contracts by forbidding Hertz to collect fees for rental cars that it had already contracted to receive. *See* U.S. Const. art. I, § 10. The city, however, has removed the Hertz law from any collision with the dictates of the contract clause, having assured us that the law does not apply to these outstanding contracts.

### 3 *Substantive Due Process.*

■ Economic regulation need only be rationally related to a legitimate governmental purpose. *New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 106–07, 99 S.Ct. 403, 410, 58 L.Ed.2d 361 (1978) (since demise of substantive due process in economic area, due process provides legislative bodies broad scope to experiment with economic problems); *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978) (citing *Ferguson v. Skrupa,* 372 U.S. 726, 730–31, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963)) (searching scrutiny of economic legislation has long been abandoned; "vague contours" of due process clause do not permit courts to sit as superlegislature to weigh wisdom of legislation).

■ The city contends that the Hertz Law will help prevent discriminatory business practices in the rental-car industry, by requiring rental-car companies to refrain from using a renter's residence in pricing and renting decisions. The city's rationale is that rental-car companies must find other means of determining and dealing with the customers who are likely to cause them high liability expenses; thus, individual customers would enjoy rates more closely related to

their own particular risk. Since it is not irrational to conclude that the city's regulation may cut down on incidents of discrimination in car rentals based on the renter's residence, the Hertz law passes this substantive due process challenge.

4. *Section 1983.*

42 U.S.C. § 1983 creates civil liability for deprivations of certain federal rights under color of state law. It is a procedural vehicle which permits suit for violations of constitutional and federal statutory provisions. *See generally* 1 Martin A. Schwartz & John E. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees* (2d ed. 1991). The district court dismissed Hertz's § 1983 claim because it rejected all of the underlying constitutional and antitrust claims. While we affirm the district court's dismissal of Hertz's claims of a regulatory taking, impairment of contracts, and violation of substantive due process, we are remanding for further consideration of its antitrust and commerce-clause claims, and leave it for the district court to determine what role, if any, § 1983 may have on the resolution of those claims.

## CONCLUSION

Reversed and remanded for further proceedings in accordance with this opinion.